**Paulette CARTER; Betty G. Erwin; Priscilla Dalrymple and Ella Graham, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Dr. Sarah MORROW, in her official capacity as Secretary of the North Carolina Department of Human Resources; John Syria, in his official capacity as Director of the North Carolina Division of Social Services; and Susan Jeffries, in her official capacity as Section Chief of the North Carolina Child Support Enforcement Agency, Defendants.**

No. C–C–81–486–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 15, 1983.

Jane Harper and Lark Hayes, Legal Services of Southern Piedmont, Inc., Charlotte, N.C., for plaintiffs Paulette Carter, Betty G. Erwin and Priscilla Dalrymple.

Carol Spruill, East Central Community Legal Services, Raleigh, N.C., for plaintiff Priscilla Dalrymple.

M. Travis Payne, Edelstein & Payne, Raleigh, N.C., for plaintiff Ella Graham.

Clifton H. Duke, Asst. Atty. Gen., Raleigh, N.C., for defendants.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### SUMMARY OF DECISION

North Carolina, like other states, has thousands of children who are not regularly supported by their fathers and who are thus in need of public welfare money. Many of those children qualify for and receive AFDC (Aid to Families with Dependent Children) payments; many others do not.

The federal government (*i.e.,* the United States taxpayer) provides AFDC money for qualified children *upon the condition, agreed to by North Carolina,* that the state provide, *for both AFDC and non-AFDC children,* a program of services to (1) locate fathers, (2) establish paternity, and (3) require delinquent fathers to support their children.

The federal government reimburses the state for three-fourths of the cost of providing these services.

Money collected from fathers of AFDC children goes, in substantial part, into the state treasury.

However, money collected from fathers of *non*-AFDC children does not go to the state but goes to the children or for their benefit.

North Carolina accepted the federal money but broke its undertaking to provide equal support collection services for non-AFDC children; both the children and the United States taxpayers were thereby short-changed.

North Carolina, to paraphrase Omar Khayyam, decided to

". . . take the cash and let the services go
Nor heed the rumble of a distant judge
. . ."

Caught in the act by this suit, the state now proposes, informally, to provide, for non-AFDC children, most, but not all, of the agreed and required services.

The state will be directed to provide them all.

### HISTORY OF PROCEEDINGS

Each of the named plaintiffs in this action is a citizen of North Carolina living with her minor child or children and separated from the other parent of those children. At the time the action commenced, plaintiffs were all in need of assistance from North Carolina's Child Support Enforcement Program and were not receiving AFDC. Plaintiffs allege that, on account of their welfare status and in violation of federal law, defendants have denied them and other non-recipients of AFDC access to the full range of state child support enforcement services.

On November 25, 1981, this court preliminarily enjoined defendants from further failure to provide each of the named plaintiffs all of the necessary and appropriate child support enforcement services provided to AFDC recipients, including in-court legal representation. The court also declared unlawful Section III.F. of the North Carolina Child Support Enforcement Manual insofar as it provides for differential treatment of non-AFDC recipients. On November 16, 1982, the court certified a class consisting of all persons situated similarly to the named plaintiffs.

On January 3, 1983, the case came on for hearing on plaintiffs' motion for summary judgment. After consideration of the oral and written arguments of counsel and all the evidence of record, the court determines that there is no genuine issue as to any material fact and that the plaintiffs are entitled to summary judgment as a matter of law.

### THE CONGRESSIONAL HISTORY AND THE PURPOSE OF THE PROGRAM.

In 1974, Congress amended the Social Security Act by adding Title IV, Part D, Pub.L. No. 93–647, 88 Stat. 2351 (codified as amended at 42 U.S.C. § 651 *et seq.* (1976 & Supp. V. 1981), *as amended by* Pub.L. No. 97–248, §§ 171–176, 51 U.S.L.W. 30–31 (September 14, 1982)). Title IV–D estab-

lished a Child Support Enforcement Program, "[f]or the purpose of enforcing the support obligations owed by absent parents to their children ..., locating absent parents, establishing paternity, and obtaining child and spousal support." 42 U.S.C. § 651.

The IV–D program was set up as an intergovernmental operation involving federal, state and local governments, with the states having primary responsibility for administering the program. In most states, including North Carolina, the state department of social services or of human resources supervises the program and state and local enforcement agencies provide the services. *See* N.C.G.S. § 110–128 *et seq.*

The Act requires each state to develop and adopt, with federal approval, a plan for the delivery of IV–D services, and spells out in considerable detail what that plan shall contain. 42 U.S.C. § 654. Once a state's plan is approved, the federal government will reimburse the state for 75 per cent of the costs incurred in providing IV–D services. 42 U.S.C. § 655(a).

In providing for child support enforcement services, Congress recognized that all too often a family's dependence on AFDC is the result of an absent parent's failure to fulfill support obligations. Congress sought to provide for recovery from such absent parents of money paid to their families by the AFDC program and to reduce the need for such payments in the future. *See* S.Rep. No. 1356, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 8133, 8145–46. Although the primary focus of the IV–D program is understandably on AFDC recipients, the Act clearly provides that services offered by the IV–D program are to be made available to anyone who applies for them:

> [T]he child support collection or paternity determination services established under the [State IV–D] plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State;
> . . .

42 U.S.C. § 654(6)(A). *See also* 45 C.F.R. § 302.33. Because "otherwise eligible" individuals are persons receiving AFDC, *see* 42 U.S.C. § 654(4), an "individual *not* otherwise eligible" (emphasis added) is, by definition, a non-recipient of AFDC.

The legislative history of Title IV–D reveals Congress' purpose in extending child support enforcement services to non-welfare families. The Senate Finance Committee explained that

> [T]he problem of nonsupport is broader than the AFDC rolls and ... many families might be able to avoid the necessity of applying for welfare in the first place if they had adequate assistance in obtaining the support due from absent parents. Accordingly, the Committee bill would require that the procedures adopted for locating absent parents, establishing paternity, and collecting child support be made available to families even if they are not on the welfare rolls.

S.Rep. No. 1356, *supra*, [1974] U.S.Code Cong. & Ad.News 8158.

Congress has subsequently strengthened its commitment to the non-welfare dimension of the IV–D program. Initially, the Act's 75 percent federal matching provision was to apply for only a year to most of the state costs of assisting non-welfare families. After a temporary extension, however, Congress amended the Act to make permanent the 75 percent federal funding of IV–D services to non-AFDC recipients. In its report on the amendment, the Senate Finance Committee emphasized the importance of these services to the IV–D program:

> The committee believes that the requirement that every State have a program of child support collection and paternity establishment services for families that are not receiving welfare is an essential component of the child support program. The purpose of the requirement is to assure that abandoned families with children have access to child support services before they are forced to apply for welfare. It is the opinion of the committee, supported by the statements of many

State child support administrators, that access to these services often means the difference between a family's reliance on welfare support and being supported by a legally responsible parent. Most of the families being served are marginally eligible for AFDC, and without child support services are likely to end up on the welfare rolls.

S.Rep. No. 336, 96th Cong., 2d Sess. 77–78, *reprinted in* [1980] U.S.Code Cong. & Ad. News 1448, 1526–27.[1]

The congressional goal of keeping single mothers and their children off the welfare rolls by providing them the full panoply of IV–D services appears to have met with considerable success. *See, e.g.,* U.S. Dept. of Health & Human Services, Office of Child Support Enforcement, *Child Support Enforcement: Sixth Annual Report to Congress for the Period Ending December 31, 1981,* p. 49 (net savings to state and federal governments of IV–D *non*–AFDC program, in terms of keeping individuals off AFDC, estimated at $124 million for 1981) (Plaintiffs' Exhibit 33).

The above outline of the legislative scheme is a necessary background to consideration of plaintiffs' challenge to the way in which defendants provide IV–D services to non-AFDC recipients.

## THE NORTH CAROLINA PROGRAM

The North Carolina Child Support Enforcement Plan, as required by Title IV–D, makes the state's IV–D services available to all individuals. Tracking the language of 42 U.S.C. § 654(6)(A), Section 2.6 of the Plan provides that

(A) [t]he child support collection or paternity determination services established under this plan are made available to any individual not otherwise eligible for such service upon application filed by such individual with the IV–D agency.

Pre-trial Stipulation 17.

However, the *North Carolina Department of Human Resources Division of Social Services Child Support Enforcement (IV–D) Manual,* which establishes the actual policy and guidelines for the local administration of the IV–D program, provides in pertinent part (Section III.F.) that

[i]n-court legal services for non-recipients must be obtained through the use of the district attorney in criminal court unless the non-recipient client wishes to retain an attorney at her own expense for a civil court proceeding. The local IV–D agency shall not use the private contracted IV–D attorney to handle non-recipient cases *except* for the necessary review of the URESA petitions. (Emphasis in original.)

Pre-trial Stipulation 18.

Plaintiffs challenge this exclusion by defendants of non-AFDC recipients from the in-court legal services provided to those who do receive AFDC. Plaintiffs also allege that local IV–D offices frequently deny all services to non-AFDC recipients by *refusing to take applications from them,* and that where non-AFDC applications *are* accepted, the local offices fail to process those cases efficiently and effectively.

Defendants admit that they previously turned away all *non*-AFDC applicants who needed in-court representation, and they have stipulated that that is their *present* practice. In their brief and at oral argument defendants claimed that they now *do* accept applications from such persons and provide them with support and follow-up services—"infrastructure"—but refer them to criminal court or private attorneys for in-court representation. (In response to this court's preliminary injunction, defendants amended their policy in December 1981 to provide that *all* services be made available to non-recipients of AFDC; recently they rescinded that amendment and authorized the referral-plus-"infrastructure" practice which they seek here to defend.) Defendants contend that their present non-

---

1. Section 174(a) of the Tax Equity and Financial Responsibility Act of 1982, Pub.L. No. 97–248, amended Title IV–D to reduce the federal reimbursement for non-recipient services from 75 to 70 percent. 51 U.S.L.W. 31 (September 14, 1982).

AFDC services achieve results comparable to those achieved for AFDC clients and thereby satisfy defendants' statutory obligation.

The program defendants would like to implement is not the program Congress created. For reasons already discussed, Congress required the states to make available to non-AFDC recipients "*the* child support collection or paternity determination services established under the [state IV–D] plan...." 42 U.S.C. § 654(6)(A) (emphasis added). These words are clear and unequivocal: the state IV–D programs must provide to non-welfare clients *the services* —not some other services—afforded to persons receiving welfare. Nothing in Title IV–D or its legislative history contradicts this plain reading of the statutory language.

Congress *has* recognized that the individual and governmental interests in the IV–D program are somewhat different in the case of non-recipients of welfare. However, Congress has taken this difference into account not by allowing the states to provide different services to non-welfare applicants, but by allowing them to charge those persons a reasonable application fee and to collect costs in excess of the fee from the parent who owes the support obligation or, in limited circumstances, from the applicant. 42 U.S.C. § 654(6)(B) & (C) (as amended, 1982). [North Carolina does not presently have in effect a fee schedule for non-AFDC applicants.]

Defendants claim that, despite the clear meaning of the statute, the federal Office of Child Support Enforcement ("OCSE") has interpreted the statute to allow the state to provide different services to persons not on welfare and that the court should defer to this interpretation. They cite *Morton v. Ruiz*, 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974). In *Ruiz*, however, the Court *refused* to defer to the Bureau of Indian Affairs' interpretation of the Snyder Act, 25 U.S.C. § 13, because the agency's interpretation was *inconsistent with congressional intent* and because the agency's own posture with regard to the provision in question had been inconsistent. 415 U.S. at 236–37, 94 S.Ct. at 1075.

The court finds that Congress clearly intended for non-recipients of AFDC to receive the same IV–D services as AFDC recipients, subject to the limitations of § 654(6)(B) & (C). Congress did not intend for the states to provide non-welfare families only "some" of the IV–D services, or to attempt, under federal supervision, to achieve "comparable" results for these families through means other than those used in AFDC cases.

Moreover, the position of the OCSE on this question has been less than consistent. In a letter of January 22, 1979, to the Director of the Division of Social Services of the North Carolina Department of Human Resources, OCSE Regional Representative Charles Post expressed the view of the Washington Office concerning the North Carolina program. "*If the results produced are the same,*" he quoted, "we feel that the North Carolina procedure is allowable." Defendants' Exhibit 1; Plaintiffs' Exhibit 4 (emphasis added). (The Washington Office instructed Post to "closely monitor the North Carolina program and procedures to determine that, *in fact,* similar results for AFDC and non-AFDC families are being effected." *Id.*) (Emphasis added.)

This reading of Title IV–D was flatly rejected by the Audit Division of OCSE. In its report for the year October 1, 1979-September 30, 1980, the Audit Division found that the state was violating federal law by failing to provide non-recipients of AFDC with the same services provided to persons receiving AFDC; the auditors recommended that the state make *all* services available to non-AFDC applicants. Plaintiffs' Exhibit 7, pp. 4–5. Commenting on this recommendation, North Carolina IV–D officials stated that OCSE Central and Regional Offices had approved the North Carolina policy of providing legal services to non-AFDC clients by use of the District Attorney and criminal court. The Auditors specifically disagreed with this position and stated it to be *their* belief that "all child

support services should be provided by IV–D to individuals not otherwise eligible [*i.e.,* not on AFDC]." *Id.* at 26. In the next year's report, the Auditors again found it to be a "major issue" that North Carolina had not made available "all services and functions to non-AFDC applicants . . . ." Plaintiffs' Exhibit 32, p. 3. (Because the state amended its procedures to comply with this court's preliminary injunction of November 25, 1981, the Auditors did not make a recommendation concerning this issue.)

Although the OCSE Regional Office has reaffirmed its acceptance of the North Carolina practice, it appears to have grown less concerned about whether that practice actually does achieve the same results for non-recipients of AFDC. Nothing in the record suggests that the Regional Office or anyone else ever determined that similar results were *in fact* being achieved for non-welfare clients. It now appears sufficient for the Regional Office that, in their view, criminal proceedings *can* achieve the same results as civil proceedings and *often* do. Defendants' Exhibit 3. Thus, even if the intent of Congress were less clear, OCSE has not presented a consistent interpretation of the statute entitled to deference by the court.

The court concludes that defendants' admitted practice of representing AFDC recipients in court while referring non-recipients of AFDC to district attorneys and magistrates violates § 654(6)(A). This is not to say, as defendants have suggested, that the state IV–D programs may never make use of district attorneys and magistrates. The statute merely requires that whatever services are provided to AFDC clients must also be made available to clients not receiving AFDC. (The states in OCSE Region IV employ a wide variety of methods to provide in-court legal representation to their clients, but North Carolina is the only state that has attempted to use different methods for AFDC and non-AFDC clients. *See* Defendants' Exhibit 15.)

Even if the court accepted defendants' interpretation of the statute, plaintiffs would still be entitled to summary judgment. Under defendants' theory, they may provide different services to non-AFDC clients only if they can *demonstrate* that such services achieve the same results achieved for AFDC clients through other means. At the time plaintiffs' motion was heard, defendants had not offered any evidence in support of their position, and, indeed, could not have done so because they had only just announced the practice which they seek to defend. (Defendants acknowledge that prior to this court's November 1981 injunction they were *not* achieving comparable results for non-recipients of AFDC because they were *not even accepting applications* from members of that group who needed in-court representation. From the time of the injunction until just before the summary judgment motion was heard this year, defendants were purporting to treat AFDC and non-AFDC clients the same in all respects; there is understandably no evidence from that period of comparable results through different means.)

Defendants' own statistics strongly indicate that, at the time of the 1981 order, defendants were doing a much poorer job for non-AFDC clients, and this pattern continued even during the period in which the two groups were allegedly being treated the same:

CASE RESULTS AS A PERCENT OF AFDC OR NON–AFDC CASELOADS

|  | 1981 | 1982 |
|---|---|---|
| AFDC cases at end of quarter | 79,139 | 77,720 |
| Non-AFDC cases at end of quarter | 13,115 | 16,199 |

| ACTION TAKEN | AFDC | | | Non–AFDC | | |
|---|---|---|---|---|---|---|
| | 4th Qtr. 1981 | 4th Qtr. 1982 | Inc. (Dec.) | 4th Qtr. 1981 | 4th Qtr. 1982 | Inc. (Dec.) |
| Parents located | 5.8% | 6.9% | 1.1% | 2.0% | 3.8% | 1.8% |
| Paternity established | 1.9% | 2.2% | .3% | .4% | .9% | .5% |
| Paternity established by court | .3% | .3% | 0 | .05% | .1% | .05% |
| Support obligations established | 3.2% | 3.6% | .4% | 1.0% | 2.4% | 1.4% |
| Support obligations established by court | .7% | .8% | .1% | .1% | .4% | .3% |
| Civil contempt actions filed | 6.9% | 7.4% | .5% | 2.2% | 2.8% | .6% |
| Criminal contempt actions filed | 1.0% | 1.0% | 0 | .3% | .5% | .2% |
| Civil contempt disposed of | 6.4% | 7.0% | .6% | 1.9% | 2.5% | .6% |
| Criminal contempt disposed of | 1.0% | 1.0% | 0 | .2% | .5% | .3% |
| Paternity established through voluntary acknowledgment | 1.6% | 7.2% | 5.6% | .3% | 1.9% | 1.6% |
| Support obligations established through voluntary acknowledgment | 2.5% | 10.3% | 7.8% | .8% | 3.2% | 2.4% |

January 3, 1983 Affidavit of Susan (Jeffries) Smith, Attachment E (appended to Defendants' Response to Plaintiffs' Motion for Summary Judgment); *see also* Plaintiffs' Exhibit 31.

These figures show that in the last quarter of 1981, as a percentage of total cases, defendants located absent parents in almost three times as many AFDC as non-AFDC cases, established paternity in almost five times as many AFDC cases, and established support obligations in more than three times as many AFDC cases. Actions to enforce support orders (civil and criminal suits combined) were filed and disposed of in more than three times as many AFDC as non-AFDC cases. This disparity, though reduced, remained significant a year later even though, pursuant to this court's preliminary injunction, defendants were purporting to treat AFDC and non-AFDC clients exactly the same.

Under the circumstances, all that defendants have been able to do is to try to defend their practices in the abstract and to ask the court to accept on faith that they *will* get the job done. Even if the court read the statute differently, it would not be willing, particularly in light of defendants' past record, to accept such speculative assurances that plaintiffs' rights to IV–D services would be protected.

Nor have defendants satisfactorily explained why, if the criminal justice system is so effective, they rely on it in so few AFDC cases. *See* Defendants' Exhibit 14 (criminal court used in only 13% of 1981 AFDC enforcement actions statewide). Defendants have offered a number of reasons, which are not convincing, why it makes sense to refer non-AFDC cases to criminal proceedings. The most obvious explanation for treating non-recipients differently is the one provided to the court by defense counsel at oral argument: *it saves the state money.* Money recovered in AFDC cases goes into government coffers, whereas the bulk of any child support collected in non-AFDC cases goes to the families. Defendants would like to limit their expenses on in-court representation to those cases where they may recoup money already paid out to AFDC recipients. However, by so doing, defendants ignore their original agreement and the congressional judgment that it is just as important for them to direct their resources toward preventing future outlays by assisting those not yet on the welfare rolls.

\* \* \* \* \* \*

The parties do not dispute, and this court finds, that, at the time this action commenced, state IV–D agencies were refusing altogether to accept applications from non-recipients of AFDC who required in-court representation, thereby denying those persons even the support and follow-up services provided to AFDC recipients when their cases are referred to criminal court. In addition, the state IV–D program was processing those non-AFDC cases that were taken much less effectively than similar AFDC cases. *See supra* p. 317.

Defendants claim that, since this court entered the preliminary injunction in November, 1981, these problems have been remedied. Defendants have stipulated, however, that

> Local IV–D workers screen non-AFDC recipient cases and, where only in-court representation is required, refer the individuals to the Magistrate, District Attorney or private attorneys for IV–D services.

Pre-trial Stipulation # 22.

And defendants' own statistics (see the table, above) show that, despite some improvement, they continue to achieve significantly worse results for non-AFDC clients than for AFDC clients.

Whatever progress defendants may have made in complying with their obligations under federal law to accept applications from non-AFDC recipients, and to process those cases effectively, has come in response to this court's preliminary injunction.

It is necessary and appropriate at this time permanently to enjoin defendants from further failure to accept applications from potential clients (subject to the provisions of § 654(6)(B) & (C)), and from discriminating in any way against, or providing services of different type or quality to, applicants or clients on account of welfare status.

Finally, in their motion for summary judgment plaintiffs request extensive injunctive relief designed not simply to remedy discrimination by defendants against non-recipients of AFDC but to overhaul the general administration of the IV–D program. In particular, they request the court to require defendants to notify clients of progress in their cases, to allow client review of case files, and to provide a "due process" hearing for applicants or clients who are denied any IV–D services.

However, in their complaint, plaintiffs have not alleged that defendants have violated either the due process clause or their obligations under 45 C.F.R. § 302.12(a)(2) to administer the IV–D program "efficiently and effectively" *in any way other than by discriminating against non-recipients of AFDC.* Thus, notwithstanding plaintiffs' arguments in their memorandum (Doc. 50), there is not now properly before the court a claim (1) that the failure to provide a hearing to persons denied IV–D services violates due process, or (2) that, as a general matter, defendants are not efficiently and effectively administering the IV–D program. The court, therefore, does not order recognition of such claims. To the extent that plaintiffs seek the additional relief discussed as a means of securing compliance with the court's order to treat non-recipients equally, the court denies such relief.

A judgment will be entered in accordance with this memorandum of decision.

## SUMMARY JUDGMENT

In accordance with the memorandum of decision entered herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. Defendants' failure to make all IV–D child support enforcement services available to members of the plaintiff class regardless of welfare status violates federal law and regulations.

2. Defendants, their successors and agents are enjoined from failing to accept applications from potential clients. This order shall not be construed to affect defendants' prerogative to charge reasonable fees and collect costs under the terms of 42 U.S.C. § 654(B) & (C).

3. Defendants, their successors and agents, are enjoined from discriminating in any way against members of the plaintiff class on account of their welfare status and from failing to provide them services, including in-court representation, of a type and quality the same as provided to AFDC recipients.

4. Defendants shall provide written notice of this order to all applicants for IV–D services as well as to all non-AFDC applicants who have previously been denied IV–D services on account of their welfare status.

5. In order that plaintiffs' attorneys may monitor compliance with this order, defendants shall furnish them each quarter with the following reports:

(a) Form 1392 from each local IV–D office;

(b) Form 1988 from the state IV–D office;

(c) Copies of all reviews of the defendants' IV–D program done by federal officials from the regional office of Health and Human Services; and

(d) Copies of all policy and program operation materials sent by defendants to local IV–D offices, including manual changes, memoranda and "Dear Director" letters.

6. Plaintiffs are entitled to recover costs and attorneys' fees.