## STATE of Arkansas, OFFICE of CHILD SUPPORT ENFORCEMENT, Pulaski County *v.* Joey A. TERRY

98-1279                                              985 S.W.2d 711

Supreme Court of Arkansas
Opinion delivered February 11, 1999

*Angela Dodson* and *Amy L. Ford*, for appellant.

*Boyd A. Tackett, Jr.*, for appellee.

D ONALD L. CORBIN, Justice. Appellant State of Arkansas, Office of Child Support Enforcement, Pulaski County (OCSE), appeals the judgment of the Pulaski County Chancery Court granting Appellee Joey A. Terry's motion to prohibit OCSE from representing the interests of his ex-wife, Lisa Terry Smith, in an attempt to collect past-due child support from him. The chancellor prohibited OCSE's representation of Lisa on the ground that the agency had previously represented Joey's interest while he was the custodial parent. On appeal, OCSE argues that the trial court erred in ignoring the plain language of Ark. Code Ann. § 9-14-210(d) and (e) (Repl. 1998), which provides that OCSE represents the State of Arkansas and does not represent the assignor of the support rights. This case was certified to us by the Arkansas Court of Appeals, pursuant to Ark. Sup. Ct. R. 1-2(d), because it presents an issue of first impression. We find merit to OCSE's argument and reverse.

The record reflects the following facts. On February 13, 1991, a consent decree was entered granting Joey a divorce from Lisa and awarding custody of the couple's two minor children to Joey. Lisa was ordered to pay child support of $100 per month to Joey. Approximately five years later, on March 6, 1996, Joey and Lisa entered into an agreed order, wherein it was determined that they would have joint custody of the children; Lisa was granted physical custody of the children, subject to Joey's rights of visitation. Joey was ordered to pay child support of $100 per month to Lisa.

On December 2, 1997, Joey petitioned the chancery court for a change of custody, asserting that there had been a material change in circumstances and that it would be in the best interest of the children that he be awarded custody. On March 18, 1998, Joey filed a second amended petition, moving the chancellor to restrain OCSE from representing Lisa on the matter of past-due child support from Joey. Attached to the second amended petition was a copy of the December 26, 1991 contract between Joey and OCSE, wherein Joey assigned his child-support rights to the agency in exchange for its assistance in collecting the support. OCSE responded to Joey's petition by asserting that, pursuant to section 9-14-210, OCSE represents the State of Arkansas and does not undertake an attorney-client relationship with the custodial parent who has assigned his or her child-support rights to the agency.

A hearing was held on June 3, 1998, during which both Lisa and Joey were represented by private counsel; the attorney for OCSE appeared solely for the reason of enforcing Lisa's assigned child-support rights. The chancellor granted Joey's motion, finding that because OCSE "theoretically represented" Joey for purposes of child support while he was the custodial parent, OCSE was now prohibited from representing Lisa in the same cause. The chancellor acknowledged the language of section 9-14-210(d) and (e), but nonetheless found that "the ethical considerations are of paramount concern when opposing parties have used the same agency or attorneys for the same or similar issues in litigation against each other." OCSE brings this appeal for determination of the issue of whether its attorneys represent, as an individual client, the assignor of child-support rights within the context of a true attorney-client relationship. Resolution of this issue necessarily requires our construction of section 9-14-210.

■ We adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 974 S.W.2d 464 (1998). In determining the meaning of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* If the language of a statute is plain and unambiguous, and conveys a clear and definite

meaning, there is no occasion for resorting to rules of statutory interpretation. *Office of Child Support Enforcement v. Harnage*, 322 Ark. 461, 910 S.W.2d 207 (1995). Section 9-14-210 provides in part:

(d) *The State of Arkansas is the real party in interest for purposes of establishing paternity and securing repayment of benefits paid and assigned past due support,* future support, and costs in actions brought to establish, modify, or enforce an order of support in *any* of the following circumstances:

(1) Whenever public assistance under the Transitional Employment Assistance Program, i.e., Temporary Assistance for Needy Families, or § 20-77-109 or § 20-77-307 is provided to a dependent child; or

(2) *Whenever a contract and assignment for child support services have been entered into for the establishment or enforcement of a child support obligation for which an automatic assignment under § 9-14-109 is not in effect;* or

(3) Whenever duties are imposed on the state pursuant to the Uniform Interstate Family Support Act, § 9-17-101 et seq.

(e)(1) In any action brought to establish paternity, to secure repayment of government benefits paid or assigned child support arrearages, to secure current and future support of children, or to establish, enforce, or modify a child support obligation, the Department of Human Services, the Office of Child Support Enforcement, or both, or their contractors, may employ attorneys.

(2) *An attorney so employed shall represent the interests of the Department of Human Services or the Office of Child Support Enforcement and does not represent the assignor of an interest set out in subsection (d)* of this section.

(3) *Representation by the employed attorney shall not be construed as creating an attorney-client relationship between the attorney and the assignor of an interest set forth in subsection (d)* of this section, or with any party or witness to the action, other than the Department of Human Services or the Office of Child Support Enforcement, regardless of the name in which the action is brought. [Emphasis added.]

■ This court has only had one occasion to review section 9-14-210. In *Harnage*, 322 Ark. 461, 910 S.W.2d 207, the issue was whether the State was the real party in interest such that it could bring and maintain a paternity action against the alleged father, Harnage. As in the instant case, the child's mother had entered into a contract and assignment of child-support services with OCSE. Harnage contended that the assignment of support was not enough to render the State the real party in interest, because the child had not received public assistance during her minor years. This court concluded:

> The three criteria in [section 9-14-210(d)] are listed in the disjunctive, and the Office is a real party in interest when any one of the three conditions is met. *Nowhere in § 9-14-210(d)(2) does it require that public funds be expended on behalf of the child before the Office is deemed a real party in interest under this subdivision.*

*Id.* at 464, 910 S.W.2d at 208 (emphasis added). Thus, for purposes of determining the real party in interest in a situation where the custodial parent has assigned his or her child-support rights to OCSE, it is immaterial whether the custodial parent is receiving public assistance on behalf of the child.

In *Vanzant v. Purvis*, 54 Ark. App. 384, 927 S.W.2d 339 (1996), our court of appeals addressed an issue under section 9-14-210 that is closely related to the one at hand. The issue there was whether the attorney for OCSE represented the appellant-mother for purposes of proving valid service of process under ARCP Rule 5(b). The appellant had assigned her child-support rights to OCSE for enforcement. The appellee-father had attempted service on the appellant through OCSE's attorney, Mr. Butler. The court of appeals concluded that service on Mr. Butler was insufficient because he did not represent the appellant. The court of appeals reasoned that the scope of Mr. Butler's representation was defined by section 9-14-210 and concluded that because the appellant had executed a contract with OCSE to assign her child-support rights, Mr. Butler was prohibited from representing the appellant. We concur with the court of appeals' interpretation of the scope of OCSE's attorneys' representation under section 9-14-210. That holding is equally applicable here, despite the fact that the circumstances of this case are somewhat different. To deter-

mine the particular issue presented here, we examine cases from other jurisdictions.

In *Gibson v. Johnson*, 582 P.2d 452 (Or. Ct. App. 1978), the plaintiff, a recipient of Aid to Dependant Children (ADC), brought a class action against the attorney general and two assistant attorneys general assigned to the Support Enforcement Division (SED). The plaintiff contended that the actions taken by the SED attorneys in enforcing the child-support obligation assigned to the state created an attorney-client relationship between the SED attorneys and those persons who were receiving public assistance and had assigned their child-support rights to the state. The law in effect at the time required recipients of ADC to assign to the Department of Human Resources any right to support that they may have. Particularly, Oregon Revised Statutes 23.789(2) provided:

> In any case involving a child or custodial parent or other dependent person who is a recipient of public assistance or care, support or services, the Support Enforcement Division of the Department of Justice *shall represent* such child or children, caretaker parent, other dependent person or the Department of Human Resources for the purpose of seeking modification, or enforcement through contempt proceedings, garnishment, an order for assignment of wages . . . of any order or decree entered under ORS chapter[s] 107, 108, 109, 110, or 419.

*Id.* at 455-56 (emphasis added). The trial court found that section 23.789(2) created at least a nominal attorney-client relationship. The Oregon Court of Appeals disagreed, concluding that no attorney-client relationship was created under the statute:

> The general statutory plan is that the recipient must assign support rights to the state, and the state, with the required cooperation of the recipient-assignor, collects the support from the obligor. *The support is collected on behalf of the state as assignee and not on behalf of the recipient. The essence of this statutorily created relationship is that of assignor-assignee. The mere fact that the assignor is required to cooperate with the attorney for the assignee does not establish an attorney-client relationship. The contact between the recipient and the SED attorneys is for the benefit of the state in recouping some of the funds paid out for aid to dependent children.* The state may enforce the obligation whether the recipient cooperates or even over the

specific objection of the recipient-assignor. If the SED attorneys were representing the recipient in an attorney-client relationship, it would seem the wishes of the recipient would have to be given some status in the decision to proceed.

It is true the ADC recipient can reap the benefits of a support decree, obtained by the SED on behalf of the state, after the ADC benefits are terminated. This is merely an ancillary benefit of the state's enforcement of the support obligation for its own purposes and does not create an attorney-client relationship.

*Id.* at 456 (citations omitted) (emphasis added).

In a more recent case, *Haney v. State*, 850 P.2d 1087 (Okla. 1993), the Supreme Court of Oklahoma took the holding in *Gibson* one step further. There, the issue was whether an attorney-client relationship is created between a custodial parent who is *not* receiving Aid to Families with Dependent Children (AFDC) and the district attorney who contracted with the Department of Human Resources to enforce that child-support obligation. Observing that the Oklahoma statutory scheme allows both recipients and non-recipients of AFDC to apply for assistance in collecting and enforcing child-support obligations, the court concluded that there was no attorney-client relationship in such a situation. The court further observed that the state has a pecuniary interest in the enforcement of child-support orders regardless of whether the custodial parent is receiving public assistance. The court held that Title IV, Part D, of the Social Security Act "was not only enacted in order to recoup payments made for AFDC recipients, *but also to help families avoid becoming dependent on the State through lack of support from an absent parent.*" *Id.* at 1091 (footnote omitted) (emphasis added). In holding that there was no attorney-client relationship created between the district attorneys and the assignors of child-support rights, the court concluded:

If the intent of the Legislature was to recognize or establish an attorney-client relationship between a district attorney and a custodial parent in a situation under the statutory scheme at issue here, a situation would exist which would foster or raise the potential for serious conflicts of interest within that relationship. For example, a district attorney would be compelled to prosecute his "client" should the individual violate criminal statutes. *Fur-*

*ther, if custody of the child is transferred to another, the district attorney could be compelled to enforce support payments against his former "client", which inherently would pose confidentiality problems.* We simply do not believe the Legislature intended such potential results, but instead at all times recognized district attorneys were deemed to represent the interests of the State, rather than the custodial parent.

*Id.* at 1092 (emphasis added).

In the present case, the chancellor found that despite the plain language of section 9-14-210(d) and (e), OCSE's participation on behalf of each parent, at separate times, amounted to theoretical representation of two individual clients whose interests were adverse. The chancellor placed considerable emphasis on the fact that neither Lisa nor the children were receiving public assistance, such as AFDC, and that the monies collected by OCSE from Joey would not directly benefit the State. Addressing OCSE's attorney, the chancellor stated:

> [Y]ou're not collecting State money. At one point you were seeking to help Mr. Terry get money from Mrs. Terry, now you're trying to help Mrs. Terry get money from Mr. Terry, and that, in my mind, with the traditional view of who's a client and what your duties are, puts you all in a conflict situation.

We disagree with the chancellor's conclusion for two reasons. In the first place, monies collected by OCSE on assignment directly benefit the State under the provisions of Title IV-D of the Social Security Act, codified at 42 U.S.C. §§ 651-669b. Specifically, section 656(a), as amended in 1996, provides that "[t]he support rights assigned to the State or secured on behalf of a child receiving foster care maintenance payments *shall constitute an obligation owed to such State by the individual responsible for providing such support."* (Emphasis added.) The 1996 amendment struck the words "under section 602(a)(26) of this title" after the words "assigned to the State." Section 602(a)(26) pertained to an automatic assignment of child-support rights by custodial parents receiving AFDC funds. We find significant the fact that section 656(a) was amended to remove any reference to public assistance, and that it now provides that all assigned support rights are considered obligations owed to the State.

In the second place, the stated purpose of the Title IV–D program is to enforce support obligations owed by noncustodial parents to their children and the former spouse with whom the children are living and to assure that assistance in obtaining support will be available to *all* children, whether or not they are eligible for assistance under a state AFDC program. 42 U.S.C. § 651. Courts have uniformly held that the services, legal or otherwise, furnished by the states under their approved Title IV–D plans must be the same, regardless of whether the custodial parent is receiving public assistance. *See Carter v. Morrow*, 562 F. Supp. 311 (W.D. N.C. 1983); *Thaysen v. Thaysen*, 583 So. 2d 663 (Fla. 1991); *South Carolina Dep't of Social Servs. v. Deglman*, 351 S.E.2d 864 (S.C. 1986); *State ex rel. Jeske v. Jeske*, 424 N.W.2d 196 (Wis. 1988). These decisions are consistent with this court's holding in *Harnage*, 322 Ark. 461, 910 S.W.2d 207, that the State is the real party in interest when there has been an assignment of support rights to OCSE, regardless of whether the custodial parent is receiving public assistance on behalf of the child.

The legislative history of Title IV–D further reveals Congress's purpose for extending child-support enforcement services to those families not receiving public assistance. The United States Senate Committee on Finance recognized "that the problem of nonsupport is broader than the AFDC rolls and that many families might be able to avoid the necessity of applying for welfare in the first place if they had adequate assistance in obtaining the support due from absent parents." S. Rep. No. 1356, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 8133, 8158. *See also Carter*, 562 F. Supp. 311. Six years later, discussing the proposed Child Welfare Act of 1980, the Senate Finance Committee concluded:

> The committee believes that the requirement that every State have a program of child support collection and paternity establishment services for families that are not receiving welfare is an essential component of the child support program. The purpose of the requirement is to assure that abandoned families with children have access to child support services *before they are forced to apply for welfare.* It is the opinion of the committee, supported by the statements of many State child support administrators, that access to these services often means the difference between a

family's reliance on welfare support and being supported by a legally responsible parent.

S. Rep. No. 336, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. 1448, 1526-27 (emphasis added). In *Carter*, 562 F. Supp. 311, the court explained:

> Congress *has* recognized that the individual and governmental interests in the IV-D program are somewhat different in the case of non-recipients of welfare. However, Congress has taken this difference into account not by allowing the states to provide different services to non-welfare applicants, but by allowing them to charge those persons a reasonable application fee and to collect costs in excess of the fee from the parent who owes the support obligation or, in limited circumstances, from the applicant.

*Id.* at 315 (citations omitted).

■ ■ Based upon the foregoing cases and statements of congressional purpose, we conclude that there is no legitimate reason for distinguishing custodial parents receiving public assistance from those who do not. The bottom line is that all custodial parents who assign their rights to child support to the Title IV-D agency must receive the same services, including legal services, whether they are receiving, or are otherwise eligible to receive, public assistance. The collection of child support ultimately benefits the State by providing for the financial needs of its children, without having to resort to public funds to do so. Thus, regardless of the financial status of the custodial parent, once the child support is assigned to the State, it becomes an obligation owed to the State, not the individual parent, by the noncustodial parent. In this respect, the chancellor erred in concluding that because Lisa was not receiving public assistance, OCSE was representing her, not the State. We concur with the reasoning of the Oklahoma Supreme Court in *Haney*, 850 P.2d 1087, that, once the child-support rights are assigned to the State, the State has a pecuniary interest in enforcing those rights even though the amounts collected on behalf of those assignors who are not receiving public assistance will ultimately pass from the State to the assignors and their children. Like the court in *Haney*, we conclude that in such situations, the client is the State, not the individual assignor.

Our conclusion finds support in the provisions of this State's Title IV-D plan, which, for the purposes of this appeal, are codified at Ark. Code Ann. §§ 9-14-201 to -240 (Repl. 1998). Specifically, section 9-14-206 provides that the OCSE is authorized to administer this State's plan for child-support enforcement under Title IV-D; subsection (c) provides that the OCSE is designated as a law enforcement agency. All support monies collected in such cases of assignment shall be paid through the Arkansas child support clearinghouse, pursuant to Ark. Code Ann. §§ 9-14-801 to -807 (Repl. 1998). *See* section 9-14-213. Section 9-14-212 provides that the OCSE may charge an application fee of $25 from any person who contracts for Title IV-D services and who is not receiving public assistance. Correspondingly, section 9-14-214 provides that in any action brought on behalf of a person to whom a child-support obligation is owed, OCSE shall be awarded a fee of not less than three percent and not more than six percent of the overdue support. Section 9-14-210, the subject of this appeal, provides for the employment of attorneys by OCSE to assist in collecting and enforcing child-support obligations once an assignment of those rights has been made by the custodial parent to OCSE.

We conclude that the language in section 9-14-210 is an unequivocal declaration by the General Assembly that in cases where child-support rights are assigned by the custodial parent to OCSE, the State is the real party in interest for purposes of enforcement of the support rights, and that OCSE attorneys therefore represent the interests of the State, not the individual assignor of the support rights. Moreover, it is apparent that the General Assembly, by enacting section 9-14-210(e)(3), recognized the potential conflicts of interests that would arise if the OCSE attorneys assumed an attorney-client relationship with the assignor. That subsection specifically provides that representation by the OCSE attorney "shall not be construed as creating an attorney-client relationship between the attorney and the assignor[.]" The language of that section is plain and unambiguous and conveys a clear and definite meaning; hence, there is no reason to resort to the rules of statutory construction in this case. The chancellor's ruling prohibiting OCSE attorneys to act on behalf of

its rights assigned by Lisa to enforce Joey's court-ordered child-support obligations is thus erroneous.

Moreover, because OCSE attorneys represent the State, there is no conflict of interest when the agency provides child-support services, including legal services, to one parent and then to the other parent in the event of a change of custody. In this respect, we view the role of the OCSE attorney as being closely akin to the prosecuting attorney. The prosecuting attorney is empowered to bring charges and take a judgment against the noncustodial parent for failure to pay child support as ordered. *See* Ark. Code Ann. § 5-26-401 (Repl. 1997). Clearly, there would be no conflict of interest where the prosecuting attorney sought to bring charges against the mother for nonsupport even though the father had been previously prosecuted by the same prosecuting attorney for the same crime. In such a situation, there is no conflict of interest because the prosecuting attorney does not represent the custodial parent, despite the fact that it is the custodial parent who benefits from such enforcement. The same can be said for OCSE attorneys who represent the assigned child-support rights of both parents, but at separate times. The stark reality is that custody of the children may frequently change from the mother to the father, and vice versa. The chancellor's ruling here effectively prohibits OCSE from carrying out its duties on behalf of its stated client, the State, in every case wherein custody has changed hands.

In sum, there is no conflict of interest by permitting OCSE to enforce Lisa's assigned child-support rights against Joey, even though it had previously attempted to enforce Joey's assigned rights against Lisa. No attorney-client relationship arose out of OCSE's contact with either Joey or Lisa. Rather, at all times, the OCSE attorneys represented the interest of their statutory client, the State of Arkansas, in an attempt to enforce an obligation owed to the State. Accordingly, because the chancellor's ruling runs contrary to the clear and definite meaning of the statute, we must conclude that the decision was in error.

Reversed and remanded.