Vincent MAXWELL *v.* State of ARKANSAS CHILD
SUPPORT ENFORCEMENT UNIT

CA 98-1090                                    16 S.W.3d 293

Court of Appeals of Arkansas
Divisions II, III, and IV
Opinion delivered May 17, 2000

*Brockman, Norton & Taylor*, by: *C. Mac Norton*, for appellant.

*Sandra Y. Harris*, for appellee.

SAM BIRD, Judge. This case stems from a paternity action in which Vincent Maxwell, the appellant, was adjudicated in May 1995 to be the father of a child born out of wedlock and

ordered to pay child support, past-due and current. Because the child's mother, Jozetta Halton, had received Aid to Families with Dependent Children (AFDC) benefits from the State of Arkansas, the paternity case was prosecuted by attorneys for the Arkansas Child Support Enforcement Unit (CSEU), the appellee, through the Jefferson County Office of Child Support Enforcement.

In November 1995, six months after the paternity action had been concluded, Maxwell and Halton entered into an agreement by which Halton accepted a $2,300 lump-sum payment from Maxwell in full satisfaction of Maxwell's child-support obligations, past, present, and future. They filed a joint petition in the case that had been opened originally for prosecution of Halton's paternity action against Maxwell, and, on November 15, 1995, received from the court an order approving their agreement.

Six months later, CSEU petitioned the court to set aside the November 15 order, contending: (1) that at the time the order was entered Halton was receiving AFDC and had an open child-support case with CSEU; (2) that Halton had assigned her child-support rights to CSEU; (3) that Maxwell owed child support to the State of Arkansas; (4) that Halton lacked authority to enter into the agreement; and (5) that the agreed order was void as against public policy. CSEU later amended its motion to add allegations that CSEU was the real party in interest, and that Maxwell had practiced fraud upon the court in obtaining the agreed order without notice to CSEU.

On February 19, 1997, a hearing was convened, but when Halton failed to appear, the court rescheduled the hearing for May 7, 1997, and ordered Halton to appear on that date with the child or risk being sanctioned for contempt of court. On May 7, Halton again failed to appear, and counsel for CSEU and the child's attorney ad litem argued that the agreed order was void *ab initio* and that the court should set it aside notwithstanding Halton's failure to appear. A lengthy report filed by an attorney ad litem for the child outlined numerous attempts (some successful and some unsuccessful) to communicate with Halton in Texas by telephone. However, despite clear indications that Halton received notices of the hearings, she never attended any of them.

Finally, at a scheduled hearing on January 12, 1998, the court heard the testimony of a witness called by CSEU, a child-support investigator, that revealed the following, in significant contrast to the allegations of CSEU's petition:

(a) That Halton had been an AFDC recipient "off and on," but that she was not on AFDC in November 1995 (when the joint petition was filed and the agreed order entered);

(b) That the only document CSEU had bearing Halton's signature was a copy of a notice from Halton to the Jefferson County Circuit Clerk stating that she had contracted with CSEU for non-AFDC assistance and directing that all child-support payments collected by the clerk's office be forwarded to CSEU;

(c) That CSEU did not have a contract as referred to in the above-mentioned notice, nor did CSEU have an assignment of child-support payments from Halton; and

(d) That when the agreed order of November 15, 1995, was entered, all AFDC benefits had been repaid and there were no unreimbursed grants owed to the State on Halton's account.

Following the January 12, 1998, hearing, the court entered the order of February 10, 1998, that is the subject of this appeal.[1] In that order the court held: (1) that it had jurisdiction to modify or set aside the November 15, 1995, order; (2) that CSEU had standing to challenge the validity of the November 15, 1995, order; (3) that Maxwell had practiced fraud upon the court in obtaining the November 15, 1995, order by his failure to give notice to CSEU before obtaining Halton's signature on the joint petition; and (4) that the November 15, 1995, order was void as against public policy inasmuch as it permanently terminated the rights of the child to receive support. Because we have found no authority that would permit CSEU to challenge the validity of the court's order of November 15, 1995, we reverse and remand with instructions to reinstate that order.

In reaching this decision, we are not unmindful of the broad language in State Office of Child Support Enforcem't v. Terry, 336 Ark.

---

[1] Some of the holdings set forth the chancellor's order of February 10, 1998, were originally contained in an earlier order entered January 17, 1997, and restated in the February 10, 1998, order.

310, 985 S.W.2d 711 (1999), relied upon by the dissenting judges, that would appear to support the chancellor's conclusion that CSEU has standing to challenge the court's agreed order. However, we do not find *Terry* to be controlling in the case at bar. In *Terry*, Joey Terry challenged the ethical propriety of CSEU's representation of his ex-wife in proceedings to collect child support from him, where CSEU had previously represented him in the same case in his efforts to collect child support from his ex-wife. The chancellor found that these circumstances resulted in a conflict of interest on CSEU's part, and prohibited CSEU from representing Terry's ex-wife. On appeal, our supreme court held that no conflict of interest existed because, under Ark. Code Ann. § 9-14-210 (Repl. 1998), CSEU's attorneys do not represent the assignors whom it is undertaking to assist in receiving child support, but represent only the interests of the State; thus, no attorney-client relationship existed between CSEU and its assignors.

■ Although, in *Terry*, the supreme court stated in dicta that, "The State is the real party in interest when there has been an assignment of support rights to CSEU, regardless of whether the custodial parent is receiving public assistance on behalf of the child....," we do not find that language applicable here. In *Terry*, it was undisputed that Joey Terry had assigned his child-support rights to CSEU and had entered into a contract by which he agreed for CSEU to collect his child-support benefits. In the case at bar, CSEU produced neither an assignment of child-support benefits from Halton nor a contract providing that Halton had agreed for CSEU to collect her child-support benefits. Arkansas Code Annotated section 9-14-210(d)(1)—(3)(Supp. 1995)[2] sets forth the following circumstances under which the State is the real party in interest:

> (1) Whenever aid under §§ 20-76-410 or § 20-77-109 is provided to a dependent child; or

> (2) Whenever a contract and assignment for child support services has been entered into for the establishment or enforcement of a child support obligation for which an assignment under § 20-76-410 is not in effect; or

---

[2] All references to statutes in this opinion shall refer to the statutes as they existed in 1995 when the paternity action was prosecuted and the agreed order was entered.

(3) Whenever duties are imposed on the state pursuant to the Uniform Interstate Family Support Act, § 9-17-101 et seq.

Arkansas Code Annotated section 20-77-109 (Supp. 1995), referred to in subsection (1) of the above-quoted statute, provides that child-support rights are deemed to have been assigned to the state when the recipient has accepted medicaid assistance for or on behalf of the child. However, this section is not applicable in this case because there is no indication in the record that Halton ever accepted medicaid assistance for or on behalf of the child here involved.

■ Arkansas Code Annotated section 20-76-410 (Repl. 1991), also referred to in subsection (1), provides that child-support rights are deemed to have been assigned to the State by a recipient of public assistance grants, but only to the extent of rights that have "[a]ccrued at the time such assistance, or any portion thereof, is accepted." Ark. Code Ann. § 20-76-410(c)(2). The evidence presented by the child-support investigator is that, while Halton had previously been a recipient of AFDC benefits "off and on," all of those benefits had been repaid, and that, in November 1995, Halton was not recieving any public-assistance benefits and there were no unreimbursed AFDC grants. While, under § 20-76-410(c), there had been an automatic assignment of Halton's child-support rights, that assignment had been satisfied by the repayment of all the public assistance that Halton had received.

■ Subsection (2) of the above-quoted statute is applicable only when a contract and assignment have been entered into with the State for the establishment and enforcement of a child-support obligation. The state produced neither a contract nor an assignment in this case. Therefore, subsection (2) is not applicable.

■ Likewise, subsection (3) is not applicable to this case because it relates only to cases under the Uniform Interstate Family Support Act, which is not involved in this case.

■ Even if it could be said Halton had previously contracted with and assigned her child-support rights to CSEU, we do not read *Terry* as authority for the State to continue to prosecute child-support collection on behalf of a former AFDC recipient, such as Halton, on whose behalf all benefits previously received from the state have been repaid, who subsequently entered into a private agreement with the child-support obligor for the compromise of

her personal child-support claims, who is currently neither receiving nor claiming any public assistance benefits, and who has expressed no interest in modifying or setting aside her private agreement with, or receiving child support from, Maxwell. Although, in *Terry*, the supreme court quoted from *Haney v. State*, 850 P.2d 1087 (Okla. 1993), that "the Social Security Act 'was not only enacted in order to recoup payments made for AFDC recipients, *but also to help families avoid becoming dependent on the State through lack of support from the absent parent*,'" *Terry*, 336 Ark. at 317, 985 S.W.2d at 715 (emphasis in original), we do not interpret this language to mean that, in cases where all public assistance has been repaid, the CSEU is empowered to prosecute child-support cases on behalf of former public-assistance recipients against their will, in the absence of some showing that the former recipient is still in need of public assistance, or is at risk of becoming dependent on the State in the foreseeable future. If that were the interpretation to be given to the Social Security Act, we do not see what would prevent the CSEU from targeting a child-support obligor and prosecuting a claim against him or her on the basis of its unsupported, subjective expectation that the child in question may, someday, be in need of some form of public assistance.

■ In the case at bar there was no evidence presented as to the financial needs of Halton or the child. There was no evidence that the child is a potential candidate for the receipt of public-assistance benefits. While it may be true that CSEU has standing to enforce the child-support obligations of its assignors, past and present, we do not interpret *Terry* as granting to CSEU the unfettered authority to exercise its right of standing in the absence of some showing that the State has some interest, current or potential.

■ Regarding the chancellor's finding that the agreed order of November 15, 1995, is void as against policy we do not believe that our case law supports this position. A careful analysis of *Storey v. Ward*, 258 Ark. 24, 523 S.W.2d 387 (1995), and *Paul M. v. Teresa M.*, 36 Ark. App. 116, 818 S.W.2d 954 (1991), reveals that agreements for the termination of child support are not void, but that the court retains jurisdiction to modify such agreements when they are shown to be detrimental to the child.

In *Storey*, a divorcing party entered into an agreement under which the husband would pay support to the wife "so long as she

shall remain unmarried...." After the wife had twice remarried (during which periods of marriage the husband quit paying support), she petitioned for retroactive support for the periods during which she was married. In discussing the question of the validity of the agreement, Justice George Rose Smith said:

> In a number of cases, such as *Robbins v. Robbins*, 321 Ark. 184, 328 S.W.2d 498 (1959), we have said that the duty of child support cannot be bargained away by the parents. That does not mean, however, that the duty of support cannot be affected by the contract. What our cases actually hold is that *the duty cannot be bartered away permanently to the detriment of the child.*
>
> ...
>
> *There is certainly no principle of public policy making such a contract absolutely void,* because upon remarriage a divorced mother may have no need for child support payments from her former husband, who may himself be destitute.
>
> ...
>
> On the other hand, the parents' inability to permanently bargain away the children's right to support preserves the court's power to modify the original decree to meet subsequent conditions.

*Storey v. Ward*, 258 Ark. at 26-27, 523 S.W.2d at 390 (emphasis added).

Similarly, in *Barnhard v. Barnhard*, 252 Ark. 167, 174, 477 S.W.2d 845, 849 (1972), an action by a former wife to modify an order approving an agreement by which she was to pay child support to her former husband, the supreme court stated that, "there is no sound policy reason why she may not enter into a contract with her husband governing such contributions, ... *so long as the agreement is not adverse to the welfare of the child....*" *Barnhard v. Barnhard*, 252 Ark. 167, 174, 477 S.W.2d 845, 849 (1972) (emphasis added).

In the case at bar there has been no evidence presented that the agreement between Halton and Maxwell to terminate child support is detrimental to the welfare of their child. We should not presume that the child or the mother needs the money, especially where she refuses to return to Arkansas to present any evidence of

such need. If evidence is hereafter presented that Halton is in need of support from Maxwell for the benefit of their child, the court, acting pursuant to *Storey* and *Barnhard*, has the authority to modify its November 15, 1995, agreed order; but it is not void.

While the statistics referred to in the dissenting opinion from the *Fordham Law Review* article are informative and interesting, we do not see their relevance to this case. No doubt, the child-support caseload, AFDC and non-AFDC, has grown significantly in the past twenty-five years. But this increase in the number of child-support cases should serve as a basis for restricting CSEU's responsibilities to cases in which the State has an interest, not to enlarge its responsibility into cases where there is no showing of the need for CSEU's assistance.

The dissenting opinion's suggestion that Halton has failed to "wrest control" of this case from CSEU by substitution or intervention puts form over substance. Contrary to the dissenting opinion, Halton's involvement in this case entails far more than "simply signing a joint motion which merely added her name at the top." After all, Halton is the mother of the child whose paternity was established in this case, she is the person to whom Maxwell was ordered to make child-support payments, by a check payable to her, and she was identified as a plaintiff in the initial summons and in some of the pleadings and papers filed in the paternity case. Also, with the state having now been fully reimbursed for all benefits previously paid to Halton, she is the only person who would be entitled to receive any child support payments from Maxwell for the benefit of their child. While CSEU contended that it was the real party in interest, it did not contend that Halton was not a proper party. Furthermore, the chancellor's action in ordering Halton to appear at the May 7, 1997, hearing or face sanctions for contempt is a clear indication that the chancellor treated her as a party to the action. Except in cases involving this court's jurisdiction, we should not dispose of cases on the basis of issues neither entertained by the trial court nor briefed by the parties. *Leinen v. Arkansas Dep't of Human Servs.*, 47 Ark. App. 156, 886 S.W.2d 895 (1994).

It is apparently the position of the dissenting opinion that Halton and Maxwell could have properly obtained the court's approval of their settlement without notice to CSEU by simply filing their joint petition as a new case instead of proceeding in the

case that was opened originally by CSEU for the prosecution of the original paternity and child-support action. Regardless of any technical deficiencies in the procedure followed by Halton and Maxwell in obtaining the court's approval of their agreement, the fact remains that after Halton stopped receiving AFDC benefits and all AFDC benefits previously paid to her had been repaid, the State no longer had an interest for CSEU to protect in this case.

■ The chancellor's order of January 12, 1998, is reversed and this matter is remanded for the entry of an order consistent with this opinion.

HART, KOONCE, NEAL, and CRABTREE, JJ., agree.

ROBBINS, C.J., and JENNINGS, MEADS, and ROAF, JJ., dissent.

M ARGARET MEADS, Judge, dissenting. I do not agree with reversing this case because I believe the chancellor correctly determined that the agreed order, which forever terminated appellant's "past, present, and future" child-support obligation to his son, Kalil, is a violation of public policy and therefore is void. It is settled law in this state that the duty of child support cannot be bartered away permanently by the parents to the child's detriment. *See Storey v. Ward*, 258 Ark. 24, 26, 523 S.W.2d 387, 390 (1975); *Paul M. v. Teresa M.*, 36 Ark. App. 116, 119, 818 S.W.2d 594, 595 (1991). The rationale for these decisions is based, in part, on the principles that the interests of minors have always been the subject of jealous and watchful care by chancery courts, and that a chancery court always retains jurisdiction over child support as a matter of public policy. *Id. See also Crow v. Crow*, 26 Ark. App. 37, 41, 759 S.W.2d 570, 573 (1988).

The majority would require evidence to be presented establishing that the agreement terminating appellant's child-support obligation is, in fact, detrimental to Kalil's welfare, apparently believing that such an agreement may, in fact, be in Kalil's best interest. I think the better rule is to presume that an agreement to forever terminate a parent's "past, present, and future"child-support obligation is indeed detrimental to a child unless and until evidence is presented to the contrary.

Moreover, the cases on which the majority relies do not involve the permanent termination of child support. In *Storey v.*

*Ward, supra,* the appellant-father agreed to pay support for the parties' minor children "so long as [appellee-mother] shall remain unmarried." In *Barnhard v. Barnhard,* 252 Ark. 167, 477 S.W.2d 845 (1972), the mother agreed to pay $500 monthly to the father, who was awarded custody of the parties' three minor children. In *Paul M. v. Teresa M., supra,* the court established paternity and ordered the father to pay $30 weekly child support, despite an alleged understanding that the mother agreed to assume financial responsibility for the parties' child. None of these cases spoke to the issue presented in the case at bar.

I believe precedent demands that we hold the agreed order in this case void as against public policy, because it was an attempt to permanently deprive a child of support. I would affirm.

ROBBINS, C.J., agrees.

ANDREE LAYTON ROAF, Judge, dissenting. I cannot agree that this court should reverse a case based upon the lack of "standing" by the only named plaintiff in this action.

When Halton and Maxwell jointly petitioned to terminate Maxwell's child support obligation, the words "For Josetta (*sic*) Halton" were added beneath the caption "State of Arkansas Child Support Enforcement Unit." The State was the only plaintiff listed on all previous pleadings, motions, and orders. The State's motion to set aside the "agreed order" thus correctly asserted that it was the real party in interest. Moreover, on March 17, 1997, the court appointed J. Vernon Walker as guardian ad litem (hereinafter "ad litem") to represent the minor child's interest in the proceeding. The ad litem subsequently filed a motion that reiterated the arguments made by the State and asked that the agreed order be set aside as void on its face. In his response, Maxwell agreed that his future child-support obligation could not be permanently bargained away, but contended that the State had no authority to proceed on Halton's behalf.

Halton, who apparently had moved to Texas shortly after the agreed order was entered, never appeared at the five hearings held over a nearly two-year span on the State's motion. Although Halton never appeared for any of the hearings, both the attorney for the State and the ad litem indicated that they had made contact with her in Texas and that she indicated that she would be present

and, according to the ad litem, was interested in receiving both future and back support. The State represented that its office had child support cases involving other children of both Halton and Maxwell; that Halton had been on AFDC in 1992, 1993, and 1996 during the course of its involvement with her; that her case came to it as an AFDC case in 1990; that she was not receiving AFDC when the paternity complaint was filed in 1994, or when the agreed order was entered in November 1995; and that the only payment received from Maxwell on this case was $686 from a tax intercept in August 1996. The State further stated that its regulations require that it not close an assigned case without a statement in writing from the client that she wants her case closed and that Halton had not provided such a statement.

Ultimately, the chancellor entered an order on February 10, 1998, in which he determined that it was "inappropriate" to allow Maxwell to obtain Halton's waiver of support without notice to the State. Moreover, the chancellor noted that "any order obtained ceasing child-support until that child reaches eighteen (18) would be a violation of public policy. . . . Child-support is a continuing duty that cannot be bargained away, as was done in this case." Despite Maxwell's argument that the State did not have a legal relationship with Halton and therefore lacked standing to pursue an action on her behalf, the chancellor found that the State "had consistently appeared on [Halton's] behalf and [had] produced some documentation showing that there is a continuing legal relationship between the two parties both pursuant to the statutes . . . and the fact that she had in the past received AFDC benefits." The chancellor abated child-support from November 15, 1995, until May 15, 1996, and determined that Maxwell's arrearage totaled $6,525, less credit for the $2,300 he paid to Halton and a $686 tax-intercept credit, leaving a balance due of $3,539. The chancellor set current child-support at $25 per week and ordered that Maxwell pay an additional $25 per week on the arrearage.

On appeal, Maxwell argues that the State had no authority or standing to present this matter to the trial court, and therefore the trial court had no authority to set aside the agreed order. Maxwell points out that Halton never appeared at any of the hearings on the State's motion, despite the court's directives that she should appear and despite notices from both the State and the ad litem for her to appear. Maxwell further asserts that Halton's failure to appear or to

respond to discovery propounded to her by the ad litem was never adequately explained. Maxwell contends that because Halton never authorized the State to file the motion to set aside the agreed order or to proceed on her behalf, and because Halton's case was a non-AFDC case and the State failed to produce the contract that Halton allegedly executed with it, the State had no authority to move to set aside the agreed order.

The question to be resolved is whether, in the absence of a request from Halton, it was appropriate for the State to proceed in this matter and for the trial court to grant the State's motion. Although Maxwell correctly contends that the State never produced a written contract between Halton and the State, he does not challenge the State's authority or standing to initiate the paternity action or its involvement through the entry of the paternity judgment. Significantly, the State of Arkansas was the only plaintiff named in this action, and, contrary to both Maxwell's and the State's contentions, the State did not "represent" Halton, because, according to Ark. Code Ann. § 9-14-210(e)(2), (3) (Repl. 1998) and our supreme court, the State attorneys represent *only* the interests of the State, not the individual assignor of the support rights, and no attorney-client relationship arises out of the State contracts with the custodial parent. *State Office of Child Support Enforcem't v. Terry,* 336 Ark. 310, 985 S.W.2d 711 (1999).

In *Terry,* the supreme court further stated:

> [T]he State is the real party in interest when there has been an assignment of support rights to the State, regardless of whether the custodial parent is receiving public assistance on behalf of the child. . . . The collection of child support ultimately benefits the State by providing for the financial needs of its children, without having to resort to public funds to do so. Thus, regardless of the financial status of the custodial parent, once the child support is assigned to the State, it becomes an obligation owed to the State, not the individual parent, by the noncustodial parent. . . We concur with the reasoning of the Oklahoma Supreme Court in *Haney,* 850 P.2d 1087, that, once the child support rights are assigned to the State, the State has a pecuniary interest in enforcing those rights even though the amounts collected on behalf of those assignors who are not receiving public assistance will ultimately pass from the State to the assignors and their children.

336 Ark. at 320, 985 S.W.2d at 716-17.

Consequently, the State was the only entity with standing in this case because it was the only named plaintiff, and it had a statutorily mandated interest in enforcing child-support rights assigned to it whether or not the custodial parent is a recipient of public assistance. In a case with facts similar to the case at bar, *Department of Rev. v. Pericola*, 662 So.2d 386 (Fla. Dist. Ct. App. 1995), the District Court of Appeals of Florida held that the state agency had standing to bring an appeal and that the trial court erred in forgiving a father's child support arrearage upon stipulations signed by the mother and father but not by the state agency, which was a party and had acted on the mother's behalf in bringing the action.

I share the majority's concern about the conduct of the attorneys for the State in filing and vigorously pursuing this action despite Halton's failure to cooperate or appear for hearings; in contrast, it took the State four years after receiving the case to file the paternity complaint. However, it is not surprising that the State views itself in the driver's seat in these cases. The role of public attorneys in child-support enforcement has grown dramatically since the creation in 1975 of the Child Support Enforcement Program under Title IV-D of the Social Security Act. Barbara Glesner Fines, *From Representing "Clients" to Serving "Recipients": Transforming the Role of the IV-D Child Support Enforcement Attorney*, 67 Fordham L. Rev. 2155 (1999). The total IV-D child-support caseload grew from 2.1 to 20.1 million between 1976 and 1995. *Id.* The proportion of non-AFDC Title IV-D cases has likewise grown; such cases now make up nearly half of all IV-D cases. *Id.*

All states participate in the Title IV-D program, and the federal government pays sixty-six percent of state administrative costs. *Id.* Nearly all states, including Arkansas, now expressly disclaim an attorney-client relationship with parents or children or define the relationship as one in which the child-support-enforcement attorney represents the state or enforcement agency alone. *Id.* Clearly, under the current law, public policy, and even the caption of the case, this is the State's case, not Ms. Halton's. Moreover, although it is unclear from the record before us where, or with whom, the minor child resides, Maxwell does not argue that the State lacks

standing because the child is not presently an Arkansas resident, and we need not address that question.

To be sure, there are serious public policy questions raised by this federally mandated legislation, and compounded by the State's current policy in which it no longer even names the custodial parent as a party in its cases. In fact, the Uniform Parentage Act, which has not been adopted in Arkansas, recognizes this problem, and provides that the child, the natural mother, and putative father shall all be made parties to a paternity action. *See* Unif. Parentage Act § 9, 9B U.L.A. 312 (1987). However, any policy questions raised by Arkansas's Title IV-D-mandated legislation are certainly beyond this court's authority to address. Moreover, Ark. Code Ann. § 9-14-105(c)(Repl. 1998) provides that "any person age eighteen (18) or above *to whom support was owed* during his minority may file a petition for judgment against the non-supporting parent or parents," giving the child the independent right to pursue uncollected support arrearages upon reaching adulthood.

It may well be that Ms. Halton wished to wrest control of this case from the State and to remove it, to the extent that it is possible, from her affairs. However, she failed to properly do so by signing a joint motion which merely added her name at the top. Our rules of civil procedure provide the means by which this can be accomplished, through either substitution, Ark. R. Civ. P. 25, or intervention, Ark. R. Civ. P. 24. It goes without saying that the State would be entitled to notice of the filing of any motions in this regard, as provided by Ark. R. Civ. P. 5. Here, Maxwell's failure to give notice to the State of the filing of the "joint" motion is a further reason why this case should be affirmed.

While the prevailing judges apparently believe that this case should be reversed because the State lacks standing, they do not explain how the only named plaintiff in a case in which the trial court has continuing jurisdiction can be deprived of standing without any notice whatsoever, and in a manner that constitutes a flagrant violation of our procedural rules. If this is a "technical deficiency," it is a serious one. It also should go without saying that both our trial and appellate courts are required on a regular basis to apply and enforce our rules of procedure, often with dire consequences to the parties before us. This court certainly lacks the authority to either fashion a special rule for these State child sup-

port cases or to declare an exemption from our present rules for parties such as Mr. Maxwell.

JENNINGS, J., agrees.